UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - -X
JOHN R. PATTERSON, et al.,                    :

                    Plaintiff,         :    73 Civ. 3058
                                        (WCC)
       - against -                        :

NEWSPAPER AND MAIL DELIVERERS' UNION OF        :
NEW YORK AND VICINITY, et al.,
                                     :

                    Defendants.        :
- - - - - - - - - - - - - - - - - - - - - - -X
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,       :

                    Plaintiff,         :    73 Civ. 4278
                                          (WCC)
       - against -                        :

NEWSPAPER AND MAIL DELIVERERS' UNION OF        :
NEW YORK AND VICINITY, et al.,
                                     :

                    Defendants.        :
- - - - - - - - - - - - - - - - - - - - - - -X

ON APPEAL FROM DETERMINATION OF INTERIM        :
ADMINISTRATOR WILLIAM S. ELLIS                      CLAIM NO. 230
                                       :
- - - - - - - - - - - - - - - - - - - - - - -X


**A P P E A R A N C E S :**

                              FORSYTHE, HOLBROOK, PATTON, BOVONE,
                                SEWARD & ELLIS
                              **Interim Administrator**
                              420 Lexington Avenue, Suite 2805
                              New York, New York 10170-2899

WILLIAM S. ELLIS, ESQ.

       Of Counsel




*Copies Mailed to Counsel of Record*

**A P P E A R A N C E S :  (continued)**

NAACP LEGAL DEFENSE &
  EDUCATIONAL FUND, INC.
2421 Valley Street
Berkeley, California 94702

CHARLES STEPHEN RALSTON, ESQ.

      Of Counsel

- and -

NAACP LEGAL DEFENSE &
  EDUCATIONAL FUND, INC.
99 Hudson Street, Suite 1600
New York, New York  10013

NORMAN J. CHACHKIN, ESQ.
ROBERT H. STROUP, ESQ.

      Of Counsel

**Attorneys for Claimants Donald
Roberts, Richard Harvey, Edward
Goins and John Taylor**

LITTLER MENDELSON P.C.
**Attorneys for Tribune New York
Holdings, Inc.**
885 Third Avenue, 16th Floor
New York, New York  10022-4834

GERALD T. HATHAWAY, ESQ.
LESLIE J. NEW, ESQ.

      Of Counsel

MEYER, SUOZZI, ENGLISH & KLEIN,
  P.C.
**Attorneys for Newspaper and Mail
Deliverers' Union of New York and
Vicinity**
1350 Broadway, Suite 501
New York, New York  10018

RICHARD F.X. GUAY, ESQ.

      Of Counsel

**CONNER, Senior D.J.:**

In 1973, a class of private plaintiffs and the Equal Employment Opportunity Commission (the "EEOC") brought two civil rights actions against the Newspaper and Mail Deliverers' Union of New York and Vicinity (the "NMDU" or the "Union") and more than fifty news publishers and distributors within the Union's jurisdiction. Both suits charged that the Union, with the acquiescence of the publishers and distributors, had historically discriminated against minorities, and that the structure of the collective bargaining agreement, combined with nepotism and cronyism, had perpetuated the effects of past discrimination in violation of Title VII of the Civil Rights Act of 1964. Each lawsuit sought an affirmative action program designed to help minorities achieve the status they would have had in the newspaper delivery industry but for the alleged discriminatory practices.

On September 19, 1974, then-District Judge Lawrence W. Pierce issued an Opinion and Order approving a settlement between the parties and incorporating the Settlement Agreement into a Consent Decree (the "Settlement Agreement" or "Consent Decree"), familiarity with which is presumed. *See Patterson v. Newspaper and Mail Deliverers' Union*, 384 F. Supp. 585 (S.D.N.Y. 1974) *aff'd*, 514 F.2d 767 (2d Cir. 1975), *cert. denied*, 427 U.S. 911 (1976). The Settlement Agreement implements an affirmative action program which modifies the hiring procedures for newspaper deliveries under the industry-wide collective bargaining agreement. Under the Consent Decree, each employer maintains a work force of steady employees, known as regular situation holders, for its minimum delivery needs. To accommodate fluctuations in circulation, the publishers are permitted to supplement their work force with temporary workers, known as daily shapers.

The daily shapers are divided into three groups with descending hiring priorities. Those

1

shapers on the Group I list have first priority, after the regular situation holders, in order of their shop seniority. The next priority belongs to Group II shapers. Group II consists of all persons holding regular situations or Group I positions with other employers in the industry. The last priority belongs to Group III shapers.

In addition, the Settlement Agreement also establishes an Administrator, appointed by the Court, to implement the provisions of the Consent Decree and supervise its performance. The Settlement Agreement authorizes the Administrator to hear claims concerning violations of the Consent Decree and appeals from his decision are heard in this Court.

This Court vacated the Consent Decree in 1992 by a July 8, 1992 Opinion and Order because the decree's statistical minority employment goal had been met. *Patterson v. Newspaper and Mail Deliverers' Union*, 797 F. Supp. 1174, 1185 (S.D.N.Y. 1992) (Conner, J.), *aff'd*, 13 F.3d 33 (2d Cir. 1993), *cert. denied*, 513 U.S. 809 (1994) (hereinafter, "Termination of Patterson Decree Decision"). However, the Administrator retained jurisdiction "to hear and decide all claims" instituted under the Consent Decree before July 29, 1992, and his powers were limited to that purpose.[1] *Id.*

Pursuant to this grant of authority, on February 28, 2003, the Interim Administrator (the "Administrator"), issued an order in denominated "Claim No. 230" (the "Order" or "Decision"). In accordance with the Settlement Agreement, claimants Donald Roberts, Richard Harvey and Edward

---

[1] Our original opinion sustained the Administrator's jurisdiction over claims filed before July 8, 1992. *Id.* at 1185. However, upon reconsideration, the cut-off date was extended to July 29, 1992. *See* Judgment of July 29, 1992.

Goins[2] (collectively, the "claimants")[3] and defendants NMDU and Tribune New York Holdings, Inc. ("New York Holdings" or "defendant employer") (collectively, the "defendants") seek review of this Order. The Court has reviewed the memoranda submitted by the parties and, for the reasons set forth below, affirms the Administrator's Decision except for one claim by Harvey which is remanded to the Administrator for a determination on the merits. In addition, this case is remanded to the Administrator for a determination of the amount of the back pay awards to Taylor and Goins.

## BACKGROUND

### I.    Factual Allegations

All claimants were employed by New York Holdings at the New York Daily News[4] (the "Daily News") in the collective bargaining unit represented by the NMDU. (New York Holdings Def. Mem. Supp. Review at 2.) Each claimant has made separate claims against New York Holdings and the NMDU. The claims of each claimant may be briefly summarized as follows:

Taylor: His first claim arose in 1980 when he alleged that he was not given overtime that was due to him and that the delivery route he was working which entitled him to automatic overtime was wrongfully taken from him when he requested the overtime pay. This claim, denominated as Claim

---

[2] The Administrator denied the claim of Harvey, the three claims of Roberts and one claim of Goins. However, the Administrator ruled in Goins's favor on two of his claims and in favor of claimant John Taylor on one of his claims.

[3] All references to the "claimants" herein are inclusive of John Taylor who is not appealing any of the Administrator's determinations.

[4] New York Holdings was the publisher of the New York Daily News which was sold by New York Holdings in 1991. (New York Holdings Def. Mem. Supp. Review at 2.) It should also be noted that Tribune New York Holdings, Inc. was formerly known as New York News, Inc.

No. 90, was settled before the Administrator; however, Taylor alleges that New York Holdings did not honor a settlement agreement with respect to Claim No. 90. (Administrator's Decision, ROA 006497.)

Goins: He alleges that the following acts, which resulted in the denial of overtime to him, were discriminatory: (1) "the denial of overtime to him to work in the Bronx on Friday night;" (2) "overtime taken away from him with respect to a Saturday bulldog route;" and (3) "the failure to assign him to a Harlem C.O.D. on Saturday nights which allegedly involved higher rates than other routes." (*Id*., ROA 006497-98.)

Roberts: He alleges that he was discriminated against in the following instances: (1) when the Daily News failed to give him a clerical job; (2) when the Daily News failed to award him a freight run; and (3) when the Daily News failed to make him a supervisor. (*Id.*, ROA 006498.)

Harvey: He alleges that he is due damages for years of discriminatory treatment during the years he worked at the Daily News, from 1983 through 1987. (*Id*.)

The factual allegations of the individual claimants will be discussed in greater detail in the Discussion section, in which the Administrator's determinations are reviewed. However, we will first briefly describe the relevant employment practices at the Daily News.

During the time period in which all of the claims arose there was no formal application procedure to obtain employment at the Daily News; rather, the Daily News employed a shape and bidding system to fill jobs. (Claimants Mem. Supp. Review at 4.) The shape and bidding system operates as follows:

> An individual who wished to work there [at the Daily News] would first attend daily shapes, of which there were one at each of the shifts that day. At the shapes, if there were driving or other jobs available, the shape foreman would fill them based on the status of the persons at the shape. The lowest level were those persons who were off-

4

list. They would get jobs only if there were no persons higher than they. After working a specified number of hours in a year, an individual would be placed an [sic] the Group IV list, which was posted at the shape. After getting work as a member of the Group IV list for a set number of hours in a year, the individual would move up to the Group III list and from there, to the Group I list and to the level of regular situation holder as a member of the Newspaper and Mail, and Deliverers' Union (NMDU). Group I and union card holders employed by other newspapers, such as the New York Times, could shape at the Daily News, where they would be placed on the Group II list. At a shape, available jobs were filled in the reverse order, with regular situation holder being the first selected, then Group I, Group II, Group III, Group IV, and off-list shapers in that order.

. . . .

Once an employee reached full union status as a regular situation holder, he or she was entitled to bid for permanent jobs as they became available. During the first six-month period, new regular situation holders could be displaced by a senior union member a maximum of six times from jobs he or she had bid into. Once a regular situation holder had gone through six job changes, or at the end of six months, he or she was entitled to keep the job he or she was in as his or her permanent bid job. The union member would not be displaced from that job unless he or she chose to bid on another job that came available and received the new job through seniority. All jobs in the bargaining unit below foreman that were filled permanently were required to be posted for bid and awarded on the basis of seniority.

Jobs on the shape were jobs that were available because the regular situation holder was absent, on vacation, etc., or open for any other reason. [Jobs] available on the shape would vary depending on the day of the week and time of the year.

(*Id.* at 4-5 (citations omitted).)

The Consent Decree superseded provisions of the Collective Bargaining Agreement with respect to an individual's movement from one list to another in order to correct the under-representation of minorities in the NMDU. (*Id.*) The Consent Decree provided that regardless of the minimum number of hours worked by an individual, the ratio of minority to white employees placed on the Group III list in any one move would be 3 to 2. (*Id.*) This ratio governed the movement to each successive Group. (*Id.* at 5.)

At the time the discrimination claims arose, Roberts, Goins and Taylor were regular situation

holders and Harvey was an off-list and then Group IV list shaper.  (*Id*.)


## II.     Procedural History of Claim No. 230

_____Claim No. 230 is the last remaining claim under the Consent Decree and was the result of the Administrator's Decision to resolve all then open claims in 1988, the year in which the Consent Decree's goals had been met.  (Administrator's Decision, ROA 006478 at 3.)   The Administrator had the EEOC submit a list of all claims then pending before the EEOC which related to employment in the delivery department of publishers and wholesalers involved in the New York newspaper industry.  (*Id*.)   By letter dated May 18, 1988, the EEOC provided the Administrator "with a list of persons who had 'filed with the EEOC in the (Patterson) case.'" (*Id*. at 4.)   The list included thirteen employees including claimants Roberts and Harvey.  The EEOC, shortly thereafter, dismissed the thirteen employees' EEOC charges and issued each a Notice of Right-to-Sue letter dated June 30, 1988 which explained that the dismissal was because the "court-appointed Administrator of the Consent Decree . . . [had] assumed jurisdiction of these cases." (*Id*. (citations omitted).).  These individuals' claims became Claim No. 230.

Claim No. 230 has been the subject of two prior decisions by this Court: *Patterson v. Newspaper and Mail Deliverers' Union*, 760 F. Supp. 1087 (S.D.N.Y. 1991) (Conner, J.) ("*Patterson Claim 230 I*") and *Patterson v. Newspaper and Mail Deliverers' Union*, 884 F. Supp. 869 (S.D.N.Y. 1995) (Conner, J.) ("*Patterson Claim 230 II*").  (New York Holdings Def. Mem. Supp. Review at 3.)  In *Patterson Claim 230 I*, this Court held that the Administrator had jurisdiction

to hear the claims.[5]  In *Patterson Claim 230 II*, this Court affirmed the Administrator's ruling that the claim should not be dismissed for failure to prosecute and that summary judgment should be denied.  Subsequent to the decision in *Patterson Claim 230 II*, nine of the claimants settled their disputes with New York Holdings, but the claims of Roberts and Harvey remained.  (New York Holdings Def. Mem. Supp. Review at 4.)

With respect to the claims of Taylor and Goins, the procedural history is more complex as their claims were not initially part of Claim No. 230.  On February 23, 1981, Taylor filed with the EEOC and New York City Commission on Human Rights a charge of discrimination against the Daily News .  (*Id*. at 5.)  Shortly thereafter, Goins filed his own charge of discrimination against the Daily News on March 5, 1981.  (*Id*.)  Seventeen years after Taylor and Goins filed their initial charges of discrimination with the EEOC they were issued Right-to-Sue letters.  (Administrator's Decision, ROA 006488.)  Upon receipt of the Right-to-Sue letters, Goins and Taylor filed a complaint in the Southern District of New York, which was assigned to this Court, *Goins v. Tribune New York Holdings*, 98 Civ. 3903 (WCC).  (*Id.*)  Goins and Taylor, by stipulation with New York Holdings, agreed to have their claims heard by the Administrator as part of Claim No. 230.  (*Id*.)

---

[5] The claims presented in Claim No. 230 were initially raised in a separate lawsuit, *Stokes v. The New York News Corp.*, et al., No. 89 Civ. 3108 (JFK), but that action was eventually dismissed.  (Claimants Mem. Supp. Review at 2.)  Prior to dismissal, the *Stokes* complaint was amended to add Goins and Taylor as plaintiffs in January 1989.  (Claimants Mem. Opp. Review at 2.)  Although many of the claimants were able to settle their claims with defendants, Taylor, Goins, Roberts and Harvey were not.  However, rather than allowing the claims to proceed in federal court, we ruled in *Patterson Claim 230 I* that the Administrator should decide the claims that were alleged in the *Stokes* case.  (Claimants Mem. Supp. Review at 2.)

### III.    The Administrator's Determination

In a Decision dated February 28, 2003, the Administrator dismissed all constituent claims in Claim No. 230 brought by the final four claimants, with the exception of Claim No. Two of Taylor and Claim Nos. Two and Three of Goins.  (Union Def. Mem. Supp. Review at 1.)  With respect to the three claims that the Administrator granted, liability was imposed on both the Union and New York Holdings.  (*Id*. at 1-2.)

### DISCUSSION

### I.    Standard of Review

The Settlement Agreement provides the Administrator with broad authority to take all actions he deems necessary to implement the provisions and to ensure the performance of the Consent Decree. It further provides that the Administrator shall hear and determine a wide variety of claims arising under the Agreement, which may then be brought before this Court for review.  (Settlement Agreement ¶ 4.)  Pursuant to his authority, the Administrator has determined that the circumstances warrant that Taylor's claim and two of Goins's claims be granted, but the claims of Harvey, Roberts, and the final claim of Goins be dismissed.

Our review of the Administrator's determinations is limited.  In *Foreman v. Wood, Wire & Metal Lathers Int'l Union, Local No. 46*, 557 F.2d 988, 992 (2d Cir. 1977), the Second Circuit noted that the scope of review of an independent administrator appointed to ensure compliance with a settlement decree is similar to that applied to an arbitrator's decision.  In *United States v. Int'l Bhd. of Teamsters*, 905 F.2d 610, 616 (2d Cir. 1990) the Second Circuit revisited the issue and reiterated that an administrator's decision is entitled to "great deference."  Thus, it is clear that an administrator's

decision cannot be rejected merely because a court may be inclined to reach a different result. *Cf. Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. (UPGWA) and its Local 537*, 47 F.3d 14, 16 (2d Cir. 1995) ("[I]f a ground for the arbitrator's decision can be inferred from the facts of the case, the award should be confirmed."). Accordingly, we will overturn the Administrator's holding only if his conclusions are clearly insupportable by the record.

## II.    Governing Legal Principles Common to All Claims

### A.    Discrimination in Violation of Title VII

Title VII prohibits an employer from discriminating against any individual "with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). It is well established that an employment discrimination claim under Title VII is analyzed under the three-step burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g., Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 n.5 (2d Cir. 1996); *Jessamy v. City of New Rochelle*, 292 F. Supp. 2d 498, 511 n.15 (S.D.N.Y. 2003) (Conner, J.).

Under the *McDonnell Douglas* analysis, claimants must first establish a *prima facie* case of discrimination. If claimants establish a *prima facie* case, a presumption that the employer discriminated is raised and the burden of production then shifts to the employer to "articulate a legitimate, clear, specific and non-discriminatory reason" for its actions.[6] *Quarantino v. Tiffany &*

---

[6] Legitimate non-discriminatory reasons are "reasons that, 'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.'" *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

*Co.*, 71 F.3d 58, 64 (2d Cir. 1995). If the employer does so, the presumption of discrimination drops out and claimants have the burden to establish by a preponderance of the evidence that the employer's stated reason was merely a pretext for discrimination. *See St. Mary's Honor Ctr.*, 509 U.S. at 515. Claimants must submit evidence that would permit a rational factfinder to infer that the discharge was actually motivated, in whole or in part, by discrimination. *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 561 (2d Cir. 1997), *cert. denied*, 525 U.S. 936 (1998). In other words, the employer's proffered reason "cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr.*, 509 U.S. at 515. The "ultimate burden" of proving intentional discrimination by a preponderance of the evidence remains with claimants at all times throughout this process. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

To establish a *prima facie* case of discrimination under Title VII, each claimant must establish that: (1) he is a member of a protected class; (2) he applied and was qualified for a job for which the employer was seeking applicants; (3) despite his qualifications, he was rejected; and (4) after his rejection, the position remained open and the employer continued to seek applicants from persons with the claimant's qualifications, or the rejection took place under circumstances giving rise to an inference of unlawful discrimination. *Patterson Claim 230 II*, 884 F. Supp. at 874; *see also Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). A *prima facie* case may also consist of evidence that racial discrimination was a defendant company's "standard operating procedure--the regular rather than the unusual practice." *Patterson Claim 230 II*, 884 F. Supp. at 874 n.5 (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977)). In addition, although a showing of disparate treatment is the most common way of establishing an inference of discriminatory intent

necessary to establish the *prima facie* case,

> the inference of discriminatory intent could be drawn in several circumstances including, but not limited to: "the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comment about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.

*Abdu-Brisson*, 239 F.3d at 468 (quoting *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (citations omitted)).

The burden to establish a *prima facie* case is *de minimis*. *See Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203-04 (2d Cir. 1995). The requirement is neither "onerous," nor "intended to be 'rigid, mechanized or ritualistic.'" *Abdu-Brisson*, 239 F.3d at 467 (internal quotations and citations omitted). Furthermore, we recognize that "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001). In addition, we note that claimants not only allege violations of Title VII, but violations of the Consent Decree as well.

**III.    Review of the Administrator's Determinations**

    **A.    Claims Granted by the Administrator**

        **1.    Procedural Considerations**

            **a.    Whether the Claims of Taylor and Goins Were Properly Part of Claim No. 230**

As a preliminary matter, we will first discuss whether the claims of Taylor and Goins were properly part of Claim No. 230. Although both parties discuss at length the issue of whether Taylor and Goins were effectively part of Claim No. 230, we find the answer to this question to be simple

and clear.  On June 19, 1998, claimants Taylor and Goins and defendant New York Holdings stipulated that the claimants' "action shall in its entirety be submitted for final and binding resolution to the Administrator appointed pursuant to the consent decree entered in . . . (the "*Patterson Action*") in the matter designated therein as Claim No. 230, in accordance with the terms of the consent decree . . . ."  (Stip. of Deferral, ROA 000311.)  The Stipulation was so ordered by this Court. Consequently, based on the parties' own agreement, the claims of Taylor and Goins are effectively part of Claim No. 230.

"A stipulation and order is a binding agreement between parties to a dispute that is enforceable as a contract." *Keiser v. CDC Inv. Mgmt. Corp.*, No. 99 Civ. 12101, 2003 WL 1733729, at * 3 (S.D.N.Y. Mar. 25, 2003) (citations omitted).  Although courts are not always bound by a stipulation and may disregard it "if it would be manifestly unjust to enforce," a party to "a stipulation is not entitled to withdraw from the agreement unilaterally." *Sinicropi v. Milone*, 915 F.2d 66, 68-69 (2d Cir. 1990) (citing *United States ex rel. Reilly v. New England Teamsters & Trucking Indus. Pension Fund*, 737 F.2d 1274, 1278 (2d Cir. 1984) (acknowledging that absent extraordinary circumstances a stipulation is binding on the parties)).  Furthermore "'[r]elief from a stipulation will be granted only upon a showing of good cause sufficient to invalidate a contract, such as fraud, overreaching, duress or mistake.'" *Keiser*, 2003 WL 1733729, at *3 (quoting *Town of Clarkstown v. M.R.O. Pump & Tank, Inc.,* 731 N.Y.S.2d 231, 232 (2d Dep't 2001)).

In the case at bar, the Stipulation was so ordered by this Court, and we have a "duty to enforce the stipulation" we approved.  *See Sanchez v. Maher*, 560 F.2d 1105, 1108 (2d Cir. 1977). Because there have been no allegations that the Stipulation was entered into as the result of fraud, overreaching, duress or mistake, the Stipulation is binding with respect to Goins, Taylor and New

York Holdings.  New York Holdings cannot now complain about what they had previously agreed to, namely that the claims of Taylor and Goins would be joined as part of Claim No. 230.  However, we note that the Union was not a party to the above-referenced Stipulation, and therefore cannot be bound by its terms.  Consequently, we will discuss the Administrator's subject matter jurisdiction over the Taylor and Goins claims with respect to the liability of the NMDU *infra*.

Because we conclude that the claims of Taylor and Goins were properly part of Claim No. 230 with respect to New York Holdings, we will now consider the merits of the defendant employer's assertions regarding these claims.

### b.    EEOC Charges

Defendants contest the awards to Taylor and Goins on several grounds not involving the merits of the claims.  Defendants contend that the Administrator should not have considered evidence of claims made by Taylor and Goins for events occurring outside the 300-day limitation period[7] or for events occurring after the filing of the relevant EEOC complaints which did not relate to the claims made in their EEOC charges.  (New York Holdings Def. Mem. Supp. Review at 11,

---

[7] Title VII requires that a charge be filed with the EEOC within 300 days of the alleged discrimination  However, "[w]hen a plaintiff experiences a 'continuous practice and policy of discrimination,' . . . 'the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'" *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994) (citations omitted).  "[A] continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted . . . to continue unremedied for so long as to amount to discriminatory policy or practice."  *Id*. at 704.  Discrete incidents of discrimination that are not related to such policies or practices, however, do not amount to a continuing violation.  *Id*. (citing *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993)).  In addition, "[t]o benefit from the continuing violation doctrine, a plaintiff must clearly assert the continuing violation both in the EEOC filing and in the complaint."  *Brown v. City of New York*, 869 F. Supp. 158, 168-69 (S.D.N.Y. 1994) (citing *Cook v. Pan Am. World Airways, Inc.*, 771 F.2d 635, 646 (2d Cir. 1985)).

21.)  The Administrator ruled against defendants on this point on the basis that he had general enforcement powers under the terms of the Consent Decree, and therefore there was no need for an EEOC complaint.  (*Id*.)  The defendants maintain that the Administrator erred on this point because he was not operating under the general powers he had under the Consent Decree, but rather under the order of this Court that was entered when the Consent Decree was vacated, which limited the Administrator's powers to resolve cases "instituted prior to the date of" the order vacating the Consent Decree.  (*Id.*)  Defendants contend that Taylor filed his EEOC complaint more than 300 days from the alleged discrimination; thus, it should not have been considered by the Administrator. (*Id*. at 11.)  Additionally, defendants contend that "the awards made in Goins' favor involve events alleged to have occurred after his EEOC charge was filed, and the claims made at trial that were the subject of the Administrator's awards did not relate back to the substance alleged in Goins' EEOC charge."  (*Id.* at 22.)

Defendants' argument relies on the fact that in the Second Circuit "'[a] district court only has jurisdiction to hear Title VII claims that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge.'"  (*Id*. (quoting *Butts v. City of New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993), *superseded by statute on other grounds as stated in Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684 (2d Cir. 1998).)  However, we agree with the Administrator that these claims could be heard by the Administrator on the basis that

> [t]here is no provision in the Settlement Agreement that states that the Administrator is bound by the administrative procedural provisions of Title VII such as filing a complaint with the EEOC or the court by 300 days of the alleged incident, or other similar provisions.  Such provisions were complied with in the two Patterson cases originally heard and reviewed by the court . . . .  The various procedural rules relating to EEOC charges are not applicable.  The Interim Administrator has discretion to

14

consider any and all claims filed prior to the termination of the consent decree, i.e., July 29, 1992 without resort to the EEOC.  This practice has been followed by the Administrator since the inception of the Settlement Agreement.

(Administrator's Decision on Evidentiary Motions, ROA 000137-38.)

In addition, ¶ 4 of the Settlement Agreement provides the Administrator with the authority "to take all actions . . . as he deems necessary to implement the provisions and to ensure the performance of the [Consent] Order."  Although in deciding the claims of Claim No. 230 the Administrator was acting under his authority to resolve cases instituted prior to the date of the vacatur of the Consent Decree, the Administrator still had authority to dispose of the remaining claims in a manner which balances the equities of and minimizes the hardships to the parties involved.  Furthermore, "[i]t has long been the position of this Court that if an individual seeks to remedy a wrong contemplated by the Consent Decree, that individual could apply to the Administrator for relief pursuant to the Consent Decree.  Paragraph 42 provides that compliance with the Settlement Agreement is compliance with Title VII . . . ."  *Patterson v. Newspaper and Mail Deliverers' Union*, 772 F. Supp. 833, 840 (S.D.N.Y. 1991) (Conner, J.).  Defendants ignore the fact that the claims presented by Taylor and Goins allege violations of both Title VII and the Consent Decree.  Even though the Consent Decree has since been vacated, the claimants' allegations involve violations of the Consent Decree while it was still in place; thus, they are actionable claims. Additionally, a prior EEOC charge is not required prior to bringing a Title VII claim against an employer or the Union under the Consent Decree because the Title VII violations are violations of the Consent Decree as well.  Consequently, the Administrator had the authority to consider and decide the post-charge claims brought by Taylor and Goins.  Accordingly, we will now consider the merits of the discrimination claims.

### 2.    Claims of John Taylor

#### a.    Merits of Claim

John Taylor, an African-American, first worked at the Daily News on October 11, 1974 and became a regular situation holder in 1979. (Claimants Mem. Opp. Review at 12.) Taylor first filed a charge of discrimination with the EEOC in 1981 alleging, *inter alia*, denial of overtime based on his race.[8] (Claimants Mem. Opp. Review at 12.) Taylor testified that he was subjected to numerous instances of discrimination of various kinds by supervisory personnel at the Daily News because of his race and was denied the opportunity to earn the same income as white drivers because of his supervisors' manipulation of the bidding and job award system.[9] (*Id*. at 12-13)

Taylor's current back pay claim arises out of a prior claim, Claim No. 90,[10] which was settled on the basis that Taylor would: (1) receive back pay for the overtime he had worked when he

---

[8] Taylor specifically alleges that the foreman, Charles Arnone, denied him overtime to which he was entitled for the delivery of "Sunday Colors" which amounted to three hours of overtime per week. (Administrator's Decision, ROA 006498.)

[9] We will address only the denial of overtime claim as that is the only claim at issue in the present motion.

[10] Claim No. 90 was based on the Daily News's failure to pay Taylor overtime for the delivery of more than five hundred comics and colors on Saturday, the Bulldog B57 job, which qualifies for three hours of overtime automatically. (Administrator's Decision, ROA 006502.) Taylor had been delivering more than five hundred colors or comics on Saturdays for about a year and a half, but was not aware of this automatic overtime until he overhead a conversation about overtime. (*Id.*) Taylor alleges that he, and the other minorities who held this job, were not aware of nor did they receive this overtime. (*Id.*) After Taylor requested the overtime which he alleged was due to him for the year and a half that he did these deliveries, the job of delivering the colors and comics was taken from him. (*Id.*) Thereafter Taylor complained to the Union and filed a complaint with the Administrator which was denominated as Claim No. 90. (*Id.*, ROA 006503.)

delivered the number of color inserts entitling him to overtime; and (2) have the opportunity for overtime for floor work comparable to the lost overtime on his route. (Claimants Mem. Opp. Review at 12-13.) Taylor alleges that this settlement agreement was not honored by the Daily News because when he asked for the promised floor work, he was told by the foreman, Arnone, that he would have to drive to get the overtime, contrary to the settlement agreement. Taylor's understanding of the agreement was that "he would be allowed to work on the floor to make up the time that he lost for the removal of the delivery of the comics and the colors from his Saturday" deliveries, yet Arnone refused to permit Taylor to earn the three-hour overtime through floor work. (Administrator's Decision, ROA 006504-05.) The Administrator determined that "there is no question . . . that the Daily News through its foremen permitted the harassment of Taylor for racial reasons and in order to deny the economic benefits of being a regular situation holder on this particular job." (*Id.*, ROA 006505-06.) The Administrator concluded that "TAYLOR was a member of the protected group, qualified for the Bulldog job for which the News was seeking applicants, was rejected in an attempt to discourage him, and meanwhile the employer continued to solicit for applicants for Bulldog Saturday positions. By his testimony the claimant has established that the employer's articulated reasons . . . were a pretext to mask unlawful discrimination. TAYLOR met his burden of proof for illegal and discriminating treatment." (*Id.*, ROA 006507.)

Taylor's claim is not clearly insupportable by the record, and therefore, must be affirmed. The Administrator relied on Taylor's testimony in making this determination and concluded that defendants' articulated reasons were merely pretext. The Court's role at this stage of the litigation is not to assess the credibility of witnesses; thus, because the Administrator's finding of discrimination is supported by the record, we affirm on the merits. However, defendants also dispute

17

the Administrator's award of damages to Taylor on jurisdictional grounds, which we will now consider.

<table>
<tr><td>_____</td><td>**b.**</td><td>**Administrator's Power to Enforce Settlement Entered in Claim No. 90**</td></tr>
</table>

Taylor's present claim which is part of Claim No. 230 was the result of the defendant employer's failure to carry out the original settlement in Claim No. 90. (*Id.*, ROA 006505-06.) The Administrator asserted jurisdiction over Taylor's claim on the basis that the "settlement agreement grant[ed] the Administrator continuing jurisdiction over the newspaper industry with multiple purposes, a period of twenty-years not only to enforce the Title VII matter, but also to ensure that from an equitable point of view the rights of minority employees were protected." (*Id.*, ROA 006508.) In doing so, the Administrator, under the terms of the Settlement Agreement "direct[ed] the enforcement of this order in Claim No. 90, and . . . order[ed] the NEWS [New York Holdings] to pay as back-pay three hours overtime weekly plus interest for the period of time that TAYLOR held the B57 job." (*Id.*, ROA 006509.)

Defendants, however, maintain that the Administrator lacked the authority to enforce the settlement entered in Claim No. 90 which was essentially closed by the Administrator in 1981. The defendants' reasoning is that the Administrator's award in favor of Taylor enforcing the Claim No. 90 settlement was based on general consent decree powers that did not exist at the time of the award because of the vacatur of the Consent Decree in 1992. (New York Holdings Def. Reply Mem. Supp. Review at 4.) Defendants contend that upon the Consent Decree's vacatur, the Administrator's powers were limited to hearing and deciding those claims pending prior to the date of the Consent Decree's termination and that the office of the Administrator was "continued for the *sole* purpose of completing said cases." (*Id.* (citing Termination of Patterson Decree Decision).)

Furthermore, defendants maintain that Taylor did not inform the Administrator that the settlement agreement in Claim No. 90 was not being complied with until his trial of the case in 2000. Consequently, defendants contend that "[b]y waiting so long, Taylor raised his dissatisfaction at a time when the Administrator no longer had any power to do anything about it. [Thus,] [t]his administrator's award in favor of Taylor was based on general powers that simply did not exist at the time of the Administrator's award, and it therefore must be set aside." (New York Holdings Def. Mem. Supp. Review at 10.) In addition, defendants assert that the mechanism for enforcement of the settlement agreement in Claim No. 90 should be a contract action, not enforcement by the Administrator pursuant to the Consent Decree. (*Id*. at 9.)

Taylor, however, rebuts defendants' argument by asserting that New York Holdings "was subject to the *Patterson* consent decree and to the procedure set out therein for determination of discrimination claims. All of the claims involved in the present case arose during the pendency of *Patterson*, and all allege violations of that decree." (Claimants Mem. Opp. Review at 6.) Thus, Taylor maintains that the Administrator had the authority to decide and enforce his claims. Taylor further directs the Court's attention to the fact that New York Holdings "successfully argued that the claims should be adjudicated pursuant to *Patterson*, rather than as independent matters . . . and the Interim Administrator had discretion to consider any and all claims that arose prior to the termination of the consent decree . . . ." (*Id*. at 6-7.)

For the following reasons, we agree with Taylor and the Administrator that the Administrator had the authority to enforce the settlement of Claim No. 90. The Consent Decree was designed to meet an affirmative action objective, but it also established procedures to balance this objective with the interests of employers, organized labor and non-minority workers. The procedures established

under ¶ 18 have governed certain aspects of the industry's operations for over two decades, and to avoid prejudicing those workers that acted in reliance on these procedures, our Order vacating the Consent Decree emphasized the Administrator's authority to dispose of the remaining claims in a manner which balances the equities of and minimizes the hardships to the parties involved. Consequently, it was appropriate for the Administrator to enforce a settlement agreement which originated as a result of the terms of the Consent Decree. The parties had entered into a settlement agreement with respect to Claim No. 90, and Taylor alleges that New York Holdings was not honoring the terms of the agreement. Failure to honor the terms of the settlement agreement is in effect a violation of the Consent Decree because the terms of the Consent Decree provide equal employment opportunities which are clearly not being afforded where the employer does not honor an agreement. In addition, because the Administrator was given the authority to dispose of remaining claims in a manner which balances the equities, it follows that he had the authority to ensure that the objectives of the Consent Decree are met, even at the individual employee level.

Furthermore, ¶ 4 of the Settlement Agreement provides that the Administrator is empowered "to take all actions . . . as he deems necessary to implement the provisions and to ensure the performance of the [Consent] Order." This paragraph also provides that the Administrator is to decide "any questions of interpretation and claims of violation of the Order by any party or by any such individual employee." Insofar as the Consent Decree was intended, in part, to remedy past discrimination and abuses of the seniority lists, and insofar as it makes specific provision for the movement of minority and non-minority employees among seniority lists as well as with respect to the assignment of jobs, the Administrator must necessarily be imbued with broad discretion in order to properly perform his function. Consequently, the Administrator had the authority to ensure that

the Consent Decree and any settlement agreements arising therefrom are being complied with. Because we conclude that the Administrator had the authority to enforce the settlement agreement in Claim No. 90 and the Administrator's finding of discrimination is not clearly insupportable by the record, we affirm the award of damages to Taylor on this claim.

### 3.    Claims of Edward Goins

Edward Goins, an African-American, began working at the Daily News on November 20, 1974 and became a regular situation holder in 1978. (*Id.* at 18.) He alleges three claims of discrimination against defendants all involving "situations where non-minority employees of less seniority than his were able to procure available desirable work without bidding or shaping for such work." (Administrator's Decision, ROA 006510.) We will now address the two claims that were granted by the Administrator; Goins's claim that was denied by the Administrator will be discussed *infra*, Part III.B.3.

Goins's first claim that was granted by the Administrator alleged "[t]hat on Friday nights he had been denied overtime in Route 233 and that a junior man had driven Rte. 233 as an extra piece and earned the overtime without the need for either bidding or shaping." (*Id.*) With respect to this claim, the Administrator concluded that Goins had met his burden of proof and that the denial of overtime was the result of racial discrimination. (*Id.*, ROA 006515.) The Administrator found that Goins presented a *prima facie* case: he is an African-American who was qualified to handle the section, which he applied for, but his application was rejected and the section was completed by a driver with less seniority than Goins. (*Id.*) In addition, the Administrator found that the Daily News's evidence in response to Goins's *prima facie* case was merely pretext because the section job

21

should have been distributed on the basis of seniority and defendants failed to explain why it was not. (*Id.*) In granting this claim, the Administrator relied on the following: (1) Goins had asked a number of foremen for the job on numerous occasions, but was denied each time; (2) Goins had spoken with business agents of the Union about the situation, but the Union failed to file a grievance on his behalf; (3) Goins was senior to the individual who ultimately performed the job; and (4) the finding that defendants' testimony of Richard Jordan asserting that Goins did not get the position because the News was trying to eliminate overtime was merely pretext because the job in question "was an essential part of preparing the Sunday paper for delivery." (*Id.*, ROA 006514-15.) The Administrator's determination is not clearly insupportable by the record because there is substantial evidence to support the inference of racial discrimination.

Goins's second claim that was granted by the Administrator alleged "[t]hat he was not able to take advantage of available desirable work despite his seniority." (*Id.*, ROA 006510.) The crux of the claim is that Goins "was denied the opportunity to bid on available work on a COD route ("cash on delivery") in Harlem, while a junior white driver, James Brill, was given such work without bidding." (*Id.*, ROA 006516.) Further, when Goins made a complaint to the Union, "nothing was done to respond to his claim or protect his seniority rights." (*Id.*) The Administrator concluded that Goins had successfully made out this claim because Goins was senior to Brill, his request to replace Brill was rejected despite his greater seniority, and defendants offered no satisfactory reason for denying Goins this desirable job despite his seniority and qualifications. (*Id.*, ROA 006517-18.) Furthermore, we agree with the Administrator that the defendants' reliance on the fact that Goins ultimately made more money than Brill is irrelevant and is merely a "pretext to mask the motive of the parties" because it does not change the fact that Goins was senior to Brill,

22

but was denied the opportunity to bid on the route in question. (*Id.*, ROA 006518.) The Administrator's determination with regard to this claim is not clearly insupportable by the record, and is therefore affirmed on the merits.

### 4. Whether Claims Were Barred by Laches

Additionally, defendants maintain that the claims of both Taylor and Goins are barred by the doctrine of laches. (New York Holdings Def. Mem. Supp. Review at 19-20, 34-35.) The defense of laches is an equitable doctrine, concerned principally with the fairness of permitting a belated claim to be enforced. *See Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946). To succeed on a claim of laches, the Court must find that there was unreasonable and inexcusable delay in commencing the action and that there was prejudice to the adverse party as a result. *See Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 592 F.2d 651, 655 (2d Cir. 1978); *Lichtenberg v. Besicorp Group Inc.*, 43 F. Supp. 2d 376, 390 (S.D.N.Y. 1999) (Conner, J.); *Sec. & Exch. Comm'n v. Willis*, 777 F. Supp. 1165, 1174 (S.D.N.Y. 1991). The laches doctrine is principally concerned with the failure to promptly pursue legal rights and remedies.

We find the defendants' contention that the doctrine of laches should apply to be without merit. The long delay between the filing of EEOC charges by Taylor and Goins and the resolution of those claims by the Administrator was through no fault of the claimants. The doctrine of laches is inapplicable to the delay in resolving the timely claims of Taylor and Goins.

### 5. Pre-Judgment Interest

Defendants contend that "to the extent that any award is sustainable," the award should not

include interest given the delays and dilatory tactics of Taylor and Goins. (New York Holdings Def. Mem. Supp. Review at 35-37.) Claimants respond to this assertion by noting that this argument is premature because "[a]lthough the Interim Administrator stated, in accordance with governing law, that prejudgment interest is a necessary component of a back pay award, he has not actually awarded any or, indeed, determined the amount of back pay." (Claimants Mem. Opp. Review at 23 (footnote omitted).) In addition, claimants point out that when they filed motions for a determination of back pay, including pre-judgment interest, as well as attorneys' fees, defendants "only presented a summary of their views as to the appropriate time frame and rates for determining back pay, but it did not present any calculations of back pay. Nor did it present any calculations as to the amount, if any, of pre-judgment interest." (*Id*. at 23-24.) Consequently, claimants maintain that although they sought to have the Administrator determine the amount of the awards prior to seeking review by this Court, so as to have a final disposition of their claims to be presented in one appeal, defendants failure to present actual calculations of back pay made this impracticable. (*Id*. at 24.) Thus, claimants maintain that it is "premature to begin arguing against any hypothetical award of pre-judgment interest." (*Id*.) We agree and accordingly remand the case to the Administrator for a determination of the actual amounts of back pay to be awarded to Taylor and Goins. The Administrator is hereby directed to hold an evidentiary hearing for the purpose of determining the amount of the awards as well as the relative liability of New York Holdings and the NMDU.

In addition, we note that "[t]o the extent . . . that the damages awarded . . . represent compensation for lost wages, 'it is ordinarily an abuse of discretion *not* to include pre-judgment interest.'" *Gierlinger v. Gleason*, 160 F.3d 858, 873 (2d Cir. 1998) (quoting *Saulpaugh v. Monroe Cmty. Hosp*., 4 F.3d 134, 145 (2d Cir. 1993) (emphasis in original, internal quotations omitted)).

"Awarding prejudgment interest in such cases prevents the defendant employer from attempting to 'enjoy an interest-free loan for as long as it can delay paying out back wages,' and helps to ensure that the plaintiff is meaningfully made whole." *Id.* (internal quotations and citations omitted).


### 6.     Liability of the NMDU

The NMDU maintains that the Administrator lacked subject matter jurisdiction over the Union to hear and decide on the merits any of the claims made by Taylor and Goins against the Union because there was no EEOC charge against the Union or timely complaint of Union discrimination raised directly with the Administrator under the Settlement Agreement prior to the vacatur of the Consent Decree. (Union Def. Mem. Supp. Review at 8.) The Consent Decree was vacated in 1992 and limited the Administrator's authority to hearing and deciding "all pending claims," and "disposing of these residual claims." (*Id.* at 5 (citing *Patterson v. Newspaper and Mail Deliverers' Union*, 820 F. Supp. 796, 799 (S.D.N.Y. 1993) (Conner, J.)).) Thus, the Union contends that since Taylor and Goins did not allege claims of discrimination against the Union prior to 1992, the Administrator lacked subject matter jurisdiction with respect to their claims.

However, the Union fails to acknowledge that Goins and Taylor were plaintiffs in the *Stokes* case which did in fact allege claims against the Union. (Claimants Mem. Opp. Review at 23.) The claims alleged in *Stokes*, involving allegations of violations of the Consent Decree and Title VII, were incorporated into Claim No. 230, which was prior to the vacatur of the Consent Decree in 1992. Consequently, we conclude that the Administrator did have subject matter jurisdiction over the Union to hear and decide the claims made by Taylor and Goins. In addition, we agree with claimants that on remand the Administrator can determine the issue of whether and to what extent the Union

was responsible for the discrimination and assess liability accordingly.

**B.    Claims Denied by the Administrator**

**1.    Claims of Richard Harvey**

Richard Harvey, an African-American, first began employment at the Daily News in 1981. (Claimants Mem. Supp. Review at 9.)  He shaped at the Daily News regularly until December of that year, but had only worked his assigned shift.  (*Id.*)  Consequently, to support himself, Harvey took a teaching job and did not shape again until August 1983, which is when his claim begins.  (*Id.*) Harvey alleges that he was "subjected to a continuing policy and practice of discrimination because of race from the time he returned to shaping at the Daily News in 1983."  (Administrator's Decision, ROA 006537 (quoting Claimants' Post-Hearing Brief at 25).)   Harvey's claims against the defendants have been summarized as follows:

> "White shapers who began shaping at or around the same time, and after, Mr. Harvey did, were given more work, were given more training on routes, earned substantially more money, and advanced to the Group IV and Group III lists ahead of him, even though he shaped 6 times a week during the entire time he worked at the Daily News. Practices that were manipulated to favor white employees included, but were not limited to, shaping and hiring procedures, route collection and reconciliation procedures, training, and job bid and assignment procedures."

(*Id.* (quoting Claimants' Post-Hearing Brief at 25 (citations omitted)).)

The Administrator, upon review of Harvey's various claims, concluded that all of his claims must be dismissed on the basis that "the evidence is insufficient to make out a prima facie case." (Administrator's Decision, ROA 006547.) Because the Administrator's Decision is entitled to "great deference," and we may only overturn his holdings if his conclusions are clearly insupportable by the record, we affirm the Administrator's dismissal of Harvey's claims because the dismissal is

26

clearly supported by the record before us.[11]  *See Int'l Bhd. of Teamsters*, 905 F.2d at 616.

We agree with New York Holdings that the claimants' arguments essentially ask the Court to "engage in a de novo review of the record, assess credibility issues, and consider arguments as to how different facts should be weighed and assessed." (New York Holdings Def. Mem. Opp. Review at 5.)  This we will not do.  Our role at this stage of the litigation is to review the record and ensure that there is sufficient evidence within the record to support the Administrator's conclusions.  As we have stated previously, if the "ground[s] for the [Administrator]'s decision can be inferred from the facts of the case, the award should be confirmed."  *Patterson Claim 230 II*, 884 F. Supp. at 872 (quoting *Burns Int'l Sec. Servs.*, 47 F.3d at 16).

With respect to Harvey's allegations that he was not given the same training as his white counterparts, the Administrator found that there was no evidence that a budget item for training was ever established by the Daily News; hence, Harvey was not denied training on the basis of his race. Harvey maintains that he did not receive training on how to do routes despite repeated requests; however, the Administrator found that his evidence concerning training was "vague and confused." (Claimants Mem. Supp. Review at 19.)  Although Harvey contends that the testimony of four witnesses "clearly established that there was a training program for new drivers and that white drivers promoted ahead of Mr. Harvey received such training," the Administrator found that "specific details" were missing with regard to these allegations.[12]  (Claimants Mem. Supp. Review

---

[11] However, we are remanding one claim made by Harvey to the Administrator for a determination on the merits because the Administrator failed to address it.  *See* discussion *infra*.

[12] For instance, the Administrator noted that "[o]n each occasion when the interrogator attempted to pin down details, the witness became vague in his responses or did not remember." (Administrator's Decision, ROA 006547.)

at 19.)  It is not within this Court's province to judge the credibility of witnesses.  Accordingly, we affirm the Administrator's Decision to dismiss Harvey's discrimination claims relating to training.

The Administrator also dismissed Harvey's claim in reference to Group IV placement because the Administrator found that the evidence supported the inference that Harvey's disciplinary mishaps were the cause of his lack of placement on jobs rather than racial animus or discrimination. (Administrator's Decision, ROA 006547.)  This finding is supported by the record.  Harvey was involved in three to four incidents per year that resulted in disciplinary action.  (*Id*.)  The mere fact that Harvey believes white employees similarly situated were not disciplined for similar professional failures or were given jobs more often is not a sufficient basis to infer discrimination.  *See Dean v. Westchester County Dist. Attorney's Office*, 119 F. Supp. 2d 424, 430 (S.D.N.Y. 2000) (Conner, J.). A party's own self-serving conclusory statements cannot sustain a Title VII claim of discrimination. *See Phipps v. Comprehensive Cmty. Dev. Corp.*, No. 00 Civ. 6063, 2005 WL 287413, at *17 (S.D.N.Y. Feb. 4, 2005); *Jessamy*, 292 F. Supp. 2d at 510 n.14; *cf. Smith v. Am. Exp. Co.*, 853 F.2d 151, 155 (2d Cir. 1988).  Consequently, we will not overturn the Administrator's conclusions with respect to this claim because his determination is not clearly insupportable by the record.

Harvey's claim regarding his denial of advancement to the Group III list was also dismissed. Harvey was not placed on the Group III list until October 1986, and was removed three weeks later when that list was revoked by order of the Administrator because it was compiled in violation of the Consent Decree.  (Claimants Mem. Supp. Review at 16.)  To arrive at a new list, the Adjustment Board went through a series of steps and eventually added eleven minorities to the Group III list: six from the Group IV list on the basis of shifts worked in 1986 and five as wild cards.  Harvey was not placed back on the Group III list because he was not picked as one of the wild cards and there were

six minorities on the Group IV list with higher seniority than him because they had worked more shifts. (Administrator's Decision, ROA 006546.)  While Harvey maintains that the failure to place him on the Group III list was the result of discrimination, the Administrator found that racial discrimination was not a contributing cause of these incidents and thus denied Harvey's claims.  We conclude that this finding is not clearly insupportable because eleven other minorities were placed on the Group III list, strongly tending to show that Harvey was not taken off the list because he is an African-American.  Therefore, we affirm the Administrator's dismissal.  However, Harvey's contention that if the Group III list compiled in April 1985 complied with the 3:2 ratio mandated by the Consent Decree he would have advanced to the Group III list was not addressed by the Administrator.  Consequently, we remand this claim to the Administrator for a determination on the merits.

We affirm the Administrator's Decision insofar as he concluded that Harvey failed to meet his burden of proof with respect to his various discrimination claims because we find this determination to be supportable by the record; however, because the Administrator failed to address Harvey's contention that if the Group III list compiled in April 1985 complied with the 3:2 ratio mandated by the Consent Decree he would have advanced to the Group III list we must remand this claim to be determined by the Administrator.

## 2.      Claims of Donald Roberts

Donald Roberts, an African-American, was one of the original plaintiffs in the first *Patterson* case which resulted in the Consent Decree. (Claimants Mem. Supp. Review at 20.) Roberts worked at the Daily News since 1972 and became a regular situation driver in 1975 as a result of the Consent

Decree. (*Id.*) While employed at the Daily News, Roberts held numerous positions including driver and floor worker. (Administrator's Decision, ROA 006519.) Roberts alleges three claims of racial discrimination against New York Holdings and the NMDU: (1) that the Daily News failed to appoint him to a foreman's position over the years because of racial discrimination; (2) that the Daily News failed to appoint him to a job as a clerk because of racial discrimination; and (3) that the job which he initially secured because of seniority was eliminated because of discrimination. (*Id.*)

The Administrator dismissed all three of Roberts's claims on the basis that the claimant failed to make out his *prima facie* case. The Administrator concluded that Roberts "failed to meet the second sections of the McDONNELL DOUGLAS prima facie test in that he was not qualified for the position which he was seeking . . . [and] also failed to prove the fourth part of his prima facie test, in that employer decisions did not give rise to an inference of discrimination." (*Id.*, ROA 006534-35.) As previously stated, the Administrator's determinations will be overturned only if they are clearly insupportable by the record. Moreover, the Court is not to evaluate the credibility of witnesses; rather the Court's role is to determine whether the Administrator's Decision is supported by the record.

We agree with the Administrator and defendants that there is ample evidence to support the conclusion that the Daily News's failure to promote Roberts to the position of foreman was not the result of discrimination. Roberts's personnel files are full of reports of disciplinary action while the individuals who were promoted did not have any disciplinary reports in their personnel files. This strongly refutes the contention that Roberts was equally qualified to be a supervisor and was not promoted because of racial discrimination. (*Id.*, ROA 006533.) Additionally, the finding that the Daily News's failure to give Roberts the clerk's position was not the result of discrimination is

supported by the record. The record indicates that Roberts was unable to prove that defendants knew of his interest in the clerical position or rejected him for the position. Indeed, Roberts himself did not recall whether he ever approached anyone within Daily News's management about a clerical position. (*Id.*, ROA 006523.) Accordingly, there is no evidence to support an inference of discrimination. Lastly, the Administrator's findings with respect to the elimination of his freight run position is not clearly insupportable by the record. Roberts failed to show up for work when he said he would. He "lost the freight run job not because of race, but because of his failure to follow simple procedures." (*Id.*, ROA 006527.)

Accordingly, we affirm the Administrator's dismissal of Roberts's claims.

### 3. Claims of Edward Goins

Goins's claim that was denied by the Administrator involved the denial of a route which would have resulted in substantial overtime to Goins, namely three hours each Saturday for a period of five or six years.[13] (*Id.*, ROA 006511.) Goins alleges that less senior white routemen were allowed to begin their routes early, earning this additional overtime. (*Id.*) Although the Administrator concluded that Goins had made out a *prima facie* case with respect to this claim, he also concluded that defendants had provided a legitimate, non-discriminatory reason for its actions, namely that the Daily News was trying to eliminate overtime, including the pre-shift overtime that Goins's claim was based on. (*Id.*, ROA 006513.) The Administrator credited the testimony of Richard Jordan, former Vice President of Labor Relations at the Daily News. (*Id.*, ROA 006511.)

---

[13] Although Goins was given the route, he was denied the opportunity of pre-shift overtime which permits an employee to come in three hours before starting time to check with their dealers as to their needs prior to delivery. (*Id.*, ROA 006510.)

Additionally, the Administrator concluded that Goins failed to provide sufficient evidence that race was indeed a factor in the decision to deny him overtime, rather than the *Daily News's* need to cut costs. Because it is not the Court's role to evaluate the credibility of witnesses and the Administrator's conclusions should only be overturned if clearly insupportable by the record, we affirm the Administrator's determinations with respect to denying Goins's claim based on the denial of pre-shift overtime.

## CONCLUSION

For all of the foregoing reasons, the Decision of the Interim Administrator in Claim No. 230, dated February 28, 2003, is affirmed in all respects. However, claimant Richard Harvey's claim that if the Group III list compiled in April 1985 had complied with the 3:2 ratio mandated by the Consent Decree he would have advanced to the Group III list was not addressed by the Interim Administrator, and we therefore remand that claim to the Interim Administrator for a determination on the merits. In addition, we remand the case to the Interim Administrator for a determination of the amounts of back pay to be awarded to claimants John Taylor and Edward Goins for the claims that were granted by the Interim Administrator and affirmed by this Court and for a determination of the relative liability of Tribune New York Holdings, Inc. and the Newspaper and Mail Deliverers' Union of New York and Vicinity.

SO ORDERED.

Dated: White Plains, New York
July 13, 2005

_William C. Conner_
Sr. United States District Judge